[Civ. No. 33390. Fourth Dist., Div. Two. Feb. 20, 1985.]

JEFF NIELSEN, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
J. L. MALLARD et al., Respondents.

COUNSEL

Moga, Trudgeon & Kuhlman and Lawrence J. Kuhlman for Petitioner.

Strantz, Sobelsohn & Elkin, Edward R. Grant and Thomas W. Bradford for Respondents.

OPINION

KAUFMAN, Acting P. J.—Applicant Jeff Nielsen seeks review of an order of the Workers' Compensation Appeals Board (WCAB or Board) denying reconsideration of the decision of the Workers' Compensation Judge (WCJ) that applicant's claim is barred by the statute of limitations.

When the petition for writ of review was originally filed in this court we denied it both because we believed the order of the WCAB was fully supported by the portion of the record attached to the petition and because the petition failed utterly to comply with rule 57, (a), of the California Rules of Court which requires a petition for review of a workers' compensation decision to include a fair statement of the material evidence if it is claimed the decision is not supported by substantial evidence. The California Supreme Court granted a hearing and retransferred the case to this court "with directions to issue an alternative writ." We interpreted the directions as requiring us to issue a writ of review and we complied. Upon further consideration it remains our opinion that substantively the Board's order is supported by the record and that the absence of a statement of the material evidence, which defect was pointed out in the answer to the petition filed several months before the petition for hearing, should have precluded issuance of a writ of review in the first instance and as an alternative basis of decision is fatal to petitioner's cause on review.

*Failure to State Material Evidence*

Rule 57, (a), of the California Rules of Court reads in pertinent part: "If it is claimed that the decision is not supported by substantial evi-

dence, the petition must fairly state all the material evidence relative to the point at issue." Petitioner's primary contention on review is that the decision of the Board is not supported by substantial evidence. Although he also asserts the decision is unreasonable and not supported by the findings, those grounds are patently unmeritorious if the decision is supported by substantial evidence. Thus, it was incumbent upon petitioner to fairly state all the material facts relative to the points he attempts to raise.

However, not only does the petition not "fairly state all the material evidence" relative to the points at issue, it contains no statement of facts at all. Indeed, the one fact stated by implication in the statement of the question allegedly presented (i.e., "that all doctors informed the Petitioner that his injury was non-industrial until a cat [*sic*] scan was finally performed") is not correct. Thus, the writ should not have issued. However, by order of the California Supreme Court the writ has issued and so petitioner's failure to comply with rule 57, (a), is presumably moot.

However, the need for and requirement of a complete statement of the material facts by the party seeking relief in an appellate court is a fundamental precept of appellate procedure, recognized in numerous decisions of the California Supreme Court and the California Courts of Appeal. As stated in *Gold* v. *Maxwell* (1959) 176 Cal.App.2d 213, 217 [1 Cal.Rptr. 226]: " '[A] claim of insufficiency of the evidence to justify findings, consisting of mere assertion without a fair statement of the evidence, is entitled to no consideration, when it is apparent, as it is here, that a substantial amount of evidence was received on behalf of the respondents. Instead of a fair and sincere effort to show that the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. And it is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondents. An appellant is not permitted to evade or shift his responsibility in this manner.' " (Accord *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], and cases there cited; *Pick* v. *Santa Ana-Tustin Community Hospital* (1982) 130 Cal.App.3d 970, 978 [182 Cal.Rptr. 85]; *Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 874 [105 Cal.Rptr. 395], and cases there cited.)

Although no decision has been called to our attention in which this rule was applied to the review of a workers' compensation decision, the reasons for the rule, as disclosed by the quoted statement from *Gold* v. *Maxwell, supra,* 176 Cal.App.2d 213, appear to be as fully germane to this type of proceeding as to an appeal, and we perceive no reason why so fundamental a rule of appellate procedure should not be applicable in the review of a workers' compensation decision. Accordingly, we hold as an alter-

native ground of decision that plaintiff's contention the decision is not supported by substantial evidence is entitled to no consideration. The result is no different, however, upon a consideration of the merits.

*The Merits*

*Facts*

Having dug out the material evidence for ourselves at the expense of substantial time and effort, the facts may be stated as follows.

Petitioner (hereafter applicant) worked as a welder for J. L. Mallard (the employer) from May 1980 through October 7, 1981, which for all practical purposes was his last day of work.[1] About 50 percent of applicant's work involved heavy lifting. He handled pieces of raw metal weighing from 20 to 100 pounds and often carried these items distances of up to 100 feet. During one 3-month period he moved large cylinders weighing 50 to 70 pounds for distances of 4 to 10 feet by lifting, scooting, pushing and pulling them throughout the day. None of this work caused him any pain. However, approximately three weeks before he left the employment applicant was assigned along with other workers to a job of disassembling and reassembling bottle racks. In doing this work he had the assistance of several co-workers and also made use of a forklift. About a week after he started on this assignment applicant noticed pain in his left leg radiating from the buttocks down the back of his leg, primarily upon prolonged sitting.

About two weeks before October 7, 1981, applicant told Kelly Coltrin, who was his foreman and also his friend, that he was experiencing pain in his left leg upon sitting. According to applicant, Coltrin thereupon suggested applicant should use the forklift more, rather than attempting to lift bodily the parts of the bottle racks. Applicant said nothing about having been injured on the job or, indeed, about having been injured, and Coltrin made no inquiry about any injury or the cause of any injury. Applicant did tell Coltrin, either in the same conversation or in one or more earlier conversations, that he had engaged in kick-boxing at the home of a friend the previous weekend and was having pain in his leg or legs. When applicant said that to Coltrin, applicant was grimacing and stated he was in a lot of pain.

Applicant completed his shift on October 7, 1981. The next morning applicant was experiencing severe pain in his left leg and telephoned the

---

[1] Applicant returned to work about six months after October 7, 1981, but he quit after three days because as a result of his condition he felt he was unable to do the work.

employer's office, informing the secretary who answered the phone that he was sick and that he was going to see a doctor. That day applicant was seen by Dr. Generoso S. Nery. When Dr. Nery asked applicant what might have caused his condition, applicant told the doctor it was due either to lifting and bending on the job or that it was attributable to an incident two weeks to a month earlier when applicant was kick-fighting with a friend.[2] Dr. Nery diagnosed the condition as tendonitis and treated applicant with physiotherapy and medication. The day he first consulted Dr. Nery, or perhaps the next day, applicant delivered to someone at the employer's office a document from Dr. Nery stating applicant was unable to work.

After treating applicant for six or seven weeks, Dr. Nery referred applicant to Dr. K. A. Shaikley. Dr. Shaikley first examined applicant on December 1, 1981. Applicant also reported the kick-boxing incident to Dr. Shaikley as the probable cause of his condition, which Dr. Shaikley diagnosed as a pulled hamstring. Dr. Shaikley saw applicant a number of times and prescribed pain medication.

About two months after he had last seen Dr. Shaikley, during which period he had no treatment, applicant decided on his own to consult Dr. Kenneth C. Lay. He first consulted Dr. Lay on April 2, 1982. Dr. Lay performed examinations, including a CAT scan. Defendant testified Dr. Lay diagnosed his condition as a nerve root impingement and stated that the condition was caused by lifting at work. Applicant testified the doctor told him this when he and applicant were discussing the results of the CAT scan. The CAT scan was performed on about April 5, 1982, but the record does not disclose the date of the reported conversation between Dr. Lay and applicant. However, in a report dated April 12, 1982, executed by Dr. Lay for submission either to applicant's group insurer or to a division of the Employment Development Department of the State of California, Dr. Lay answered "No" to the question: "In your opinion, is this disability the result of 'occupation' either as an 'industrial accident' or as an 'occupational disease'? (This should include aggravation of pre-existing conditions by occupation)". Opposite the word "Diagnosis:" the report reads: "Back strain; possible herniated disc."

---

[2]At the hearing it was a matter of great dispute as to whether or not applicant's condition occurred in and arose out of the employment. Because of the decision that applicant's claim was barred by the statute of limitations, this question was not resolved.

At least as to the first three physicians he consulted, applicant indicated to each doctor that he was or might have been injured kick-boxing. At the hearing applicant confirmed there had been such an incident at a friend's home and that he had kicked at his friend twice. However, he stated he kicked with his right leg and that he experienced no pain in his leg or back at the time of the kick-fighting incident. However, in a letter dated December 21, 1981, from Dr. K. A. Shaikley to Dr. Nery who had referred applicant to him, Dr. Shaikley stated that applicant had reported experiencing severe pain in the back of his left thigh and the ischial tuberosity region at the time of the kick-fighting incident.

Applicant was treated by Dr. Lay for a period of about five months.[3] Applicant stopped his treatment with Dr. Lay when his group insurance coverage terminated. Applicant submitted the charges by Drs. Nery, Shaikley and Lay to his group insurance carrier which paid the bills except for 20 percent which was paid by applicant.

Applicant testified emphatically he thought from the very first day he was off work that his condition was caused by the work assembling and disassembling the bottle racks but that Dr. Lay was the only one of the first three physicians he consulted who confirmed his opinion. When asked, "Prior to hearing that from Dr. Lay [that the condition was caused by lifting at work], had any other doctor ever told you what their opinion was as to the causation of your condition?" applicant answered, "No." When specifically asked whether either Dr. Nery or Dr. Shaikley had ever told him what caused his condition, applicant again answered, "No."

Applicant first consulted an attorney on April 19, 1983, after his unemployment benefits had been exhausted. The application for workers' compensation benefits was filed on behalf of applicant by his attorney on April 21, 1983, more than 18 months after the alleged injury, 12 months and 19 days after he first consulted Dr. Lay, and 12 months and 16 days after the CAT scan was performed. At no time before filing the workers' compensation application did applicant indicate to the employer he believed his condition was caused by his work.

In his report and recommendation on applicant's petition for reconsideration the WCJ stated: "Review of the petition will disclose that petitioner has failed to deal with the real issue here involved, i.e., when he acquired the knowledge (or formed the opinion) that his assertedly disabling condition was industrially induced. According to his unequivocal testimony, this took place immediately after he left work in October of 1981. [¶] In view of his failure to advise defendant employer as to his belief concerning industrial causation, any medical attention provided to him could hardly have been mistaken for a worker's [sic] compensation benefit so as to toll the Statute of Limitations. There is no evidence which might support a finding that the employer should have known that the condition in question was work related. Indeed, whether or not an injury arose out of and occurred in the course of employment was a hotly contested bona fide issue."

The Board denied reconsideration for the reasons stated in the WCJ's report and recommendation which the Board adopted and incorporated by reference.

---

[3]An attachment to a medical report from Dr. David S. Ascher dated May 26, 1983, indicates that Dr. Ascher reviewed Dr. Lay's file and that the period of treatment by Dr. Lay was from April 2 to September 23, 1982.

### Contentions, Issues and Discussion

 The applicable period of limitations is one year from the date of injury or the last date any medical benefits were furnished under the Workers' Compensation Act. (Lab. Code, § 5405.)[4] The applicant's claim is for an injury to his lower back arising out of the "stress and strain of employment," a cumulative injury from continuing trauma, so, as he argues, the "date of injury" is the date upon which he first suffered disability and either knew, or in the exercise of reasonable diligence should have known, that said disability was caused by his employment. (§§ 3208.1, 5412; see *Chavez v. Workmen's Comp. Appeals Bd.* (1973) 31 Cal.App.3d 5, 10-11 [106 Cal.Rptr. 853].)

The applicant first suffered disability from his leg injury on October 8, 1981, the day he called in sick and went to Dr. Nery. The issue before the Board was the date the applicant knew, or in the exercise of reasonable diligence should have known, that his disability was caused by his employment. (§§ 5405, subd.(a), 5412.) That is a question of fact to be determined by the Board. (*Chambers* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 556, 559 [72 Cal.Rptr. 651, 446 P.2d 531]; *Pacific Indem. Co.* v. *Industrial Acc. Com.* (1950) 34 Cal.2d 726, 729 [214 P.2d 530]; *Alford* v. *Industrial Accident Com.* (1946) 28 Cal.2d 198, 204 [169 P.2d 641]; see 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1984) § 18.03[5][a].) The Board's determination will be upheld on review if it is supported by substantial evidence including reasonable inferences to be drawn from the testimony. (*Alford* v. *Industrial Accident Com.*, *supra*; *Morrison* v. *Industrial Acc. Com.* (1938) 29 Cal.App.2d 528, 533 [85 P.2d 186].)

 Without more, applicant's emphatic testimony he thought from the very first day he was off work that his condition was caused by the work assembling and disassembling the bottle racks and his suggesting to Dr. Nery, the first physician he consulted, that his condition might have been caused by lifting and bending on his job would be sufficient to support the determination of both the WCJ and the Board that he knew or reasonably should have known as of that date that his disability was caused by the employment.

However, in both his petition for reconsideration and in his petition for review in this court applicant has asserted that until he consulted Dr. Lay and a CAT scan was performed, all the doctors by whom he was examined informed him that his injury was nonindustrial. It is then implied, although

---

[4]All statutory references will be to the Labor Code unless otherwise specified.

the applicant did not so testify, that the failure to file a claim for workers' compensation benefits within one year after October 8, 1981, resulted from applicant's reliance on the statement that his condition was nonindustrial, allegedly made by the physicians who examined him before he saw Dr. Lay. Were those the facts the Board would no doubt have determined the statute of limitations had not run and we would have affirmed that determination. (See *Chambers* v. *Workmen's Comp. App. Bd.*, *supra*, 69 Cal.2d 556, 558.)

However, applicant's own testimony belies the asserted facts. When he was asked pointblank whether either Dr. Nery or Dr. Shaikley or any other physician he had seen before Dr. Lay had ever stated to him what caused his condition the applicant answered positively that they had not. There was no evidence to the contrary. Accordingly, applicant's delay in filing an application for adjudication of claim cannot be attributed to any medical opinion given the applicant that his condition was not industrially caused.

Next, relying on a writ denied decision of a three-member panel of the Board in *International Paper Co.* v. *Workers' Comp. Appeals Bd.* (1981) 46 Cal.Comp.Cases 503, applicant contends that until an injured worker has obtained a medical opinion confirming his or her own belief the injury was industrially caused, he does not have "legal knowledge" of industrial causation. Thus, applicant argues, no finding may be made that in the exercise of reasonable diligence he or she should have known of the industrial cause of the injury within the meaning of section 5412. That is not the law.

The report of a writ denied case in California Compensation Cases usually includes only skeletal facts and the report of the decision in *International Paper Co.* v. *Workers' Comp. Appeals Bd.* is no exception. We are therefore not entirely sure of what the decision stands for, but if it stands for what the applicant claims it does, we do not agree with it. In that case, it appears the employee suffered a gradual hearing loss which got worse until he retired in 1967. In 1980, 13 years later, he first consulted a doctor about his hearing problem. The doctor advised him the hearing loss was caused by his work. Although the employee testified he believed all along his hearing problems were caused by his work, and he had never reported the hearing problem to his employer, the WCAB found the employee did not have "legal knowledge" of the relationship between his hearing loss and his work, or of his possible workers' compensation claim until after he consulted a doctor in 1980. The employer's petition for writ of review was summarily denied without opinion.

The implication from *International Paper Co.* that there can be no "legal knowledge" or knowledge of industrial causation sufficient to start the stat-

ute of limitations running where the employee actually believes the disability was industrially caused, but has not obtained a medical opinion verifying that belief is both unsound and contrary to the decisional law. (See *Alford v. Industrial Accident Com., supra,* 28 Cal.2d 198, 205; cf. *Chambers v. Workmen's Comp. App. Bd., supra,* 69 Cal.2d 556, 558.)

In *Alford* the California Supreme Court stated in relevant part: "This undisputed evidence of petitioner's pronounced and continuing physical symptoms reaching an acute stage on occasion of his several absences from his employment prior to his final termination of work on November 29, 1943, is a material consideration justifying the determination of the commission that petitioner as a reasonable man was then aware, or in the exercise of ordinary care and diligence should have been aware, that he had a respiratory disability, that it was caused by his occupation as a plaster caster, and that it was seriously impairing the efficiency of his work. [¶] *While it does not appear* in the record that prior to the permanent severance of his employment on November 29, 1943, *petitioner was informed by a physician that his physical disabilities were caused by his work, yet* beginning in January, 1943, petitioner was intermittently receiving medical treatment for the relief of his back, sore throat, successive colds, and sinus condition; and *at least several months prior to his final termination of work, there is evidence that petitioner had correlated his impaired health with his occupation. . . . From such conduct it could reasonably be inferred* [italics added] that petitioner in any event *then* [orig. italics] knew that he had a compensable disability directly traceable to his work in the dust-laden atmosphere of the plant, and that he was not depending on a medical diagnosis to give him knowledge of the injurious character of his employment on his physical well-being." (*Id.,* at pp. 205-206.)

A recent decision of the Court of Appeal, Fifth Appellate District, *City of Fresno v. Workers' Comp. Appeals Bd. (Johnson)* (1985) 163 Cal.App.3d 467 [209 Cal.Rptr. 463] reviewed the authorities at some length and concluded: "We glean from these authorities the rule that an applicant will not be charged with knowledge that his disability is job related without medical advice to that effect unless the nature of the disability and applicant's training, intelligence and qualifications are such that applicant should have recognized the relationship between the known adverse factors involved in his employment and his disability." (*Id.,* at p. 473.) ■ While we do not agree entirely with the court's analysis of all of the decisions it discussed,[5]

[5]Citing *Pacific Indem. Co. v. Industrial Acc. Com., supra,* 34 Cal.2d 726, and *Associated Indem. Corp. v. Ind. Acc. Com.* (1945) 71 Cal.App.2d 820 [163 P.2d 771], the court in *City of Fresno* stated: "There are other cases in which the courts have concluded that until the applicant receives medical advice [*sic*] of the relationship between his disability and his

and while, depending on how it is interpreted, the rule it synthesized from the decisions may be a bit overly expansive, nevertheless, we are in general agreement with the decision that the absence of a medical opinion confirming industrial causation is but one important circumstance which is to be considered together with the other circumstances in determining in a particular case whether the applicant should reasonably have known his or her injury was industrially caused. (See, e.g., *Pacific Indem. Co.* v. *Industrial Acc. Com.*, *supra*, 34 Cal.2d 726, 729-730; *Alford* v. *Industrial Accident Com.*, *supra*, 28 Cal.2d 198, 204-206.)

 Even under the rule synthesized in the *City of Fresno* decision, however, the Board's decision that the applicant here either knew or reasonably should have known that his injury was industrially caused is not

---

employment the statute of limitations does not begin to run." *City of Fresno* v. *Workers' Comp. Appeals Bd.*, *supra*, 163 Cal.App.3d 467, at p. 473.) However, the *Pacific Indemnity* case definitely does not stand for that proposition, nor do we read the *Associated Indemnity* decision as so holding. In the *Pacific Indemnity* decision the court expressly noted that the question of whether the applicant reasonably should have known his injury was industrially caused is one of fact (34 Cal.2d at p. 729) and affirmed the determination of the Board that the statute of limitations had not run because that determination was supported by substantial evidence. One of the facts mentioned by the court as tending to support the Board's determination was that no physician had ever advised the applicant his ailment was employment connected. (34 Cal.2d at p. 729.) However, many other factors were also mentioned by the court as bearing on the problem: the applicant's testimony that he first learned of the causal relationship on November 16, 1944 (*id.*); his wife's inquiry to the employer as to whether his condition was compensable and the employer's response that it was not (*id.*); the fact that his physician had not warned him against performing his usual work, flying (34 Cal.2d at p. 730); his physician's stating that it was " 'all right' for him to go ahead with his 'old work,' " (*id.*); the later advice by his physician that the disease was arrested and that he could carry on his usual work (*id.*).

Although the absence of a medical opinion concerning industrial causation was mentioned several times by the court in the *Associated Indemnity* decision, that decision still does not stand for the broad proposition that the statute of limitations does not commence to run until such medical opinion has been pronounced. The court in that case, like the court in *Pacific Indemnity*, pointed out that the question of whether an injured employee should reasonably have known his or her injury was industrially caused is a question of fact, and it, like the *Pacific Indemnity* court, affirmed the determination of the Board that the statute of limitations had not run. While the absence of medical opinion that the injury was causally related to the employment was several times mentioned, the court in fact decided the case on the basis of the principles set forth in a decision referred to as the *Glantz* case, *Continental Cas. Co.* v. *Indus. Acc. Com.* (*Glantz*) (1936) 11 Cal.App.2d 619 [54 P.2d 753]. (71 Cal.App.2d at pp. 824-825.) As the court explained, in *Glantz* the Board had determined either that the first of two successive and related injuries was not in fact a compensable injury or that the applicant could at least reasonably believe it did not constitute a compensable injury. (71 Cal.App.2d at p. 825.) So, too, in the *Associated Indemnity* case. In May 1944 the applicant suffered an abdominal injury that later proved to be a hernia, but the applicant did not learn it was a hernia until a second incident at a new employment on August 28 of the same year, following which a medical examination disclosed the hernia. The Board found: " 'Said injury was caused by strain while lifting in the month of May, 1944, but it was first reasonably discoverable and apparent *that compensable injury had been sustained* on August 30, 1944, and said last mentioned date therefore constitutes the date of injury herein.' " (*Id.*, at p. 823, emphasis added.)

contrary to law or the evidence. The injury claimed was not some exotic disease the causes of which might be obscure and debatable. The injury claimed was an injury to the applicant's lower back affecting his left leg, and his employment duties involved frequent bending and lifting heavy objects. While a layman's mistaken diagnosis of his own illness or injury as being nonindustrial is not fatal to a claim for workers' compensation benefits (*Chambers* v. *Workmen's Comp. App. Bd., supra,* 69 Cal.2d 556, 559; *Associated Indem. Corp.* v. *Ind. Acc. Com., supra,* 71 Cal.App.2d 820, 823-824), the applicant here was of the opinion as of his first day off work that his injury *was* industrially caused and he himself suggested the possibility of both industrial and nonindustrial causes of his condition to the physicians who first treated him.

We conclude the determinations by the WCJ and the Board that the applicant knew or in the exercise of reasonable diligence should have known his condition was industrially caused as of October 8, 1981, is supported by substantial evidence.

■ Next, relying on *Mihesuah* v. *Workmen's Comp. Appeals Bd.* (1972) 29 Cal.App.3d 337 [105 Cal.Rptr. 561], the applicant advances his second major contention: that the payment of 80 percent of the charges of Drs. Nery, Shaikley and Lay by the insurer under the employer's group medical insurance program constituted the furnishing of compensation benefits within the meaning of section 5405 and that his application for benefits, having been filed within one year after the last of such payments, was timely. Not so.

It is true that the opinion in *Mihesuah* contains the statements: "[T]here is no doubt that Union Oil Company's [the employer's] contributions to its group insurance policy came within the scope of section 4600, Union's partial payment of the insurance premiums, that is, accounted for payment of petitioner's medical expenses to the time of his termination. . . . [¶] Because Union's contributions to petitioner's insurance coverage came within section 4600, petitioner's application for workmen's compensation was timely under section 5405." (*Mihesuah* v. *Workmen's Comp. Appeals Bd., supra,* 29 Cal.App.3d 337, 340, italics omitted.) However, as pointed out by the California Supreme Court in *Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 329, 334-335 [137 Cal.Rptr. 878, 562 P.2d 1037], there was much more involved in *Mihesuah* than just the payment of medical expenses under the employer's group health insurance policy for which the employer had paid the premiums.

In *Mihesuah* the employee was injured and hospitalized for two months when the company truck he was driving collided with another vehicle. The

employee was driving the truck home with permission because the following morning he was to pick up some parts for work. The accident and injury were promptly reported to the employer but the employer decided to treat "the injury as a nonindustrial injury and, over the next two years, applicant received extensive benefits from Union [the employer] and its group policy carriers. Petitioner [the applicant] was not informed by Union Oil that they had decided to treat his accident on a nonindustrial basis." (*Mihesuah* v. *Workmen's Comp. Appeals Bd.*, *supra*, 29 Cal.App.3d at p. 339; see *Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.*, *supra*, 19 Cal.3d at p. 334.) Thus, the employer knew of the injury, knew the surrounding facts, and should have realized the probable industrial character of the injury, but nevertheless decided to treat the injury as nonindustrial and furnished extensive benefits including the payment of medical expenses under its group medical program for over two years. There can be no question but that the employer was estopped to claim it had not provided the benefits as compensation.

■ It is "the general rule that payments by an employer or the furnishing of treatment do not toll the statute of limitations *unless made as compensation.*" (*Stone* v. *Industrial Accident Com.* (1942) 7 Cal.Comp.Cases 226, 227, italics added; accord *Frazier* v. *Standard Oil Co. of California* (1932) 18 I.A.C. 60; see also *Del Taco, Inc.* v. *Workers' Comp. Appeals Bd.* (1982) 47 Cal.Comp.Cases 390, 392; cf. *Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.*, *supra*, 19 Cal.3d 329, 333-334.)[6] However, as explained in the *Kaiser Foundation Hospitals* decision: "Several courts have considered the meaning of 'compensation' or 'benefits' as used in section 5405, subdivisions (b) and (c), and their predecessor sections. The interpretation of these terms has been judicially related to the legislative purpose behind the 'tolling' provisions of subdivisions (b) and (c). This purpose, as we develop below, 'is the protection of the injured employee from being lulled into a sense of security by *voluntary* payments of benefits until the time to commence formal proceedings with the commission has expired.' (*Pacific Emp. Ins. Co.* v. *Ind. Acc. Com.* (1944) 66 Cal.App.2d 376, 380 [152 P.2d 501] [construing predecessor statute], italics added; see *State of Cal.* v. *Industrial Acc. Com.* (1957) 155 Cal.App.2d 288, 290 [318 P.2d 34] [construing current language].) [Orig. italics.]

"Consistent with the foregoing legislative goal, several older cases have held that if an employer or its compensation carrier, knowing of a potential claim, furnishes treatment or advances sums for purposes bearing a clear

---

[6]Section 5405 permits the filing of a claim within one year from "[t]he date of last furnishing of any *benefits provided for in Article 2 of Chapter 2 of Part 2 of this division.*" (Italics added.)

relationship to an industrial injury, such benefits will be deemed to have been given under the Act thus tolling the statute. (E.g., *Bulger* v. *Industrial Acc. Com.* (1933) 218 Cal. 716, 724 [24 P.2d 796]; *Rendleman* v. *Industrial Acc. Com.* (1966) 242 Cal.App.2d 32, 35-37 [50 Cal.Rptr. 923]; *Morrison* v. *Industrial Acc. Com.* (1938) 29 Cal.App.2d 528, 537 [85 P.2d 186]; *London G. & A. Co.* v. *Indus. Acc. Com.* (1928) 92 Cal.App. 298, 301 [268 P. 670].)

" . . . . . . . . . . . . . . . . . . . . . .

"The foregoing cases indicate that the underlying purpose of the 'tolling' provisions of section 5405 and its predecessors is to prevent a potential claimant from being misled *by an employer's voluntary acts which reasonably indicate an acceptance of responsibility for the employee's injury.* This concept has been variously phrased. (E.g., *Bulger* v. *Industrial Acc. Com.*, *supra*, 218 Cal. at p. 724 ['evidence . . . inferentially tended to create a belief in the mind of petitioner that he would be cared for by his employer . . .']; *Morrison* v. *Industrial Acc. Com.*, *supra*, 29 Cal.App.2d at p. 537 [statute should not become a 'trap to defeat just claims;' payment may 'lull [the claimant] . . . into false hopes and cause him to delay presenting his claim . . .']; *London G. & A. Co.* v. *Indus. Acc. Com.*, *supra*, 92 Cal.App. at p. 301.)" (*Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.*, *supra*, 19 Cal.3d at pp. 333-334, italics added.)

Thus, viewed in perspective, the *Mihesuah* decision is simply another in the line of decisions holding that "if an employer or its compensation carrier, knowing of a potential claim, furnishes treatment or advances sums for purposes bearing a clear relationship to an industrial injury, such benefits will be deemed to have been given under the Act thus tolling the statute." (*Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.*, *supra*, 19 Cal.3d at p. 333, and cases there cited.)

▇▇ Nothing like that is disclosed by the evidence in the instant case. Here, aside from the applicant's complaint that he was experiencing pain on the job, the employer was never informed by the applicant that he was injured or that the applicant claimed he was injured on the job. Both the WCJ and the Board expressly found: "There is no evidence which might support a finding that the employer should have known that the condition in question was work related." Thus, there is not a scintilla of evidence that would support a finding that the employer voluntarily furnished medical benefits to the applicant as compensation, nor did the payments to the applicant by the insurer under the group medical policy in any way indicate

the employer's acceptance of responsibility for applicant's injury.[7] Nor is there any evidence that would support a finding that the applicant was misled by the 80 percent payments made under the group medical insurance program to the applicant's treating physicians.

The WCJ and the Board thus properly concluded the statute of limitations was not extended or its running tolled by the group insurer's payment of 80 percent of the charges of Drs. Nery, Shaikley and Lay.

■■■ Finally, although the argument is not clearly articulated, applicant appears to place some reliance on decisions indicating an employer may be estopped to assert the statute of limitations as a defense where the employer has failed to comply with the administrative regulations requiring the employer to give notice to the employee of payment or nonpayment of benefits. (See § 138.4; Cal. Admin. Code, tit. 8, §§ 9810 et seq., 9880; see also, e.g., *Kaiser Foundation Hospitals* v. *Workers' Comp. Appeals Bd.*, *supra*, 19 Cal.3d 329, 331-332; *Reynolds* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 726 [117 Cal.Rptr. 79, 527 P.2d 631]; *Hurwitz* v. *Workers' Comp. Appeals Bd.* (1979) 97 Cal.App.3d 854, 868-873 [158 Cal.Rptr. 914]; *Buena Ventura Gardens* v. *Workers' Comp. Appeals Bd.* (1975) 49 Cal.App.3d 410, 416 [122 Cal.Rptr. 714].) The Board found no such estoppel, however, and the evidence does not establish an estoppel.

■■■ We had occasion to discuss most of the cited cases in *Hurwitz* v. *Workers' Comp. Appeals Bd.*, *supra*, 97 Cal.App.3d 854, 873, where we concluded: "The rule they establish is that when an employer has the requisite notice or knowledge of an employee's injury as to which there is a reasonable possibility the employee may be entitled to workers' compensation benefits, the employer has a duty to notify the employee of the potential right to benefits, and if the employer fails to do so, and if as a consequence the employee fails to file an application for workers' compensation benefits until after the applicable period of limitations has expired, the employer is estopped to assert the statute of limitations for a period of time equal to the delay resulting from the failure to give the required notice."

Additionally we observe that under the applicable administrative regulations the duty of an employer to give the required notice is triggered only

---

[7]On a purely technical basis, the record is devoid of evidence that the employer paid the group medical insurance premiums. In fact, the applicant never actually testified the insurance program was that of his employer. He referred to it as "his" group insurance program. It appears, however, that both the WCJ and the attorneys assumed the insurance program was available to the applicant through his employment. There is no evidence, however, whether the applicant or the employer paid the premiums.

when the employer has received "knowledge of *an injury* to an employee *as defined in Labor Code Section 3208,* or notice or knowledge of a claimed injury sufficient to afford an opportunity to make an investigation into the facts." (Cal. Admin. Code, tit. 8, § 9880, italics added.) "[A]n injury to an employee as defined in Labor Code Section 3208" is "any injury or disease *arising out of the employment* . . . ." (§ 3208, italics added.)

 Here, as already stated, in its order denying reconsideration, the Board found: "There is no evidence which might support a finding that the employer should have known that the condition in question was work related." That finding by the Board is fully supported by the record. The applicant never informed the employer of any specific injury or accident except, perhaps, the nonindustrial kick-boxing episode. He did inform his supervisor on one occasion that he was having leg pain and approximately two weeks later he called in sick and went to a doctor. From time to time he communicated with the employer by telephone advising the employer of his continued off-work status. However, he never informed the employer he believed he was injured at work. On the contrary, the evidence was that the applicant had told his supervisor he hurt himself kick-boxing.

Thus, the evidence does not establish the employer had knowledge or notice of facts from which it could or should have recognized that the applicant was injured on the job or that his condition might have arisen out of the employment. In this case the employer was not in a position of superior knowledge to the applicant in that regard; indeed, the applicant believed from the outset that his injury was caused by the work but never informed the employer of his belief. (Cf. *Reynolds, supra,* 12 Cal.3d 726, 729; *Buena Ventura Gardens, supra,* 49 Cal.App.3d 410, 416.) Nor, we might add, was there any evidence that the applicant's failure to file a claim was in any way caused by the failure on the part of the employer to give notice of nonpayment.

No estoppel was found nor does a basis for any appear.

*Disposition*

The order is affirmed.

McDaniel, J., and Rickles, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied April 17, 1985.